# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **HELEN HENDON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CV-00-PT-2421-E** |
| | ) | |
| **CITY OF PIEDMONT, ALABAMA, et. al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This cause comes to be heard upon defendants City of Piedmont, Alabama; Police Chief Jimmy Trammell; Officer Ronald Riel; and Officer Kim Cunningham's ("defendants") Motion for Summary Judgment, filed on January 25, 2001.

## FACTS

The facts of this case are, for the most part, in great dispute. The undisputed facts create a mere skeleton of the events giving rise to this action. Although many of the defendants' arguments in favor of summary judgment rely upon official immunity concepts that sometimes transcend specific actions and events, the existence of arguments that require fact-intensive analysis oblige this court to delve into the parties' radically different accounts. The court will, however, separate the undisputed facts from the disputed facts in order to more easily determine whether material facts are in dispute.

**Undisputed facts**

It is undisputed that, on July 7, 2000, around 3:40 P.M., plaintiff Helen Hendon

("plaintiff") and her son were driving in the eastbound lane of Highway 278 in Calhoun County, Alabama. At the intersection of Highway 278 and Highway 21, defendant Cunningham had attempted to create a road-block for a funeral procession. The manner in which he created the road-block is in dispute. On that day in early July, the temperature was hot– at the highest, one hundred and two degrees. The plaintiff, at the time of the incident, was seventy-four years old. She suffered from a host of medical problems, including coronary artery disease, congestive heart failure, chronic obstructive pulmonary disease, asthma, osteoarthritis, breast cancer, and an artificial knee. Her truck displayed a license-plate with the "disabled" symbol.

The plaintiff somehow passed the road-block. The manner in which she passed the road-block is in dispute. Nevertheless, defendant Cunningham observed the plaintiff's truck passing the road-block and, instead of following the plaintiff himself, radioed to another patrol car to look out for the plaintiff's vehicle. A few minutes later, he received a radio transmission that defendant Riel had stopped the plaintiff's truck on 5th Avenue in the City of Piedmont. Defendant Cunningham subsequently drove to 5th Avenue, where the plaintiff, her son, and defendant Riel were engaged in an exchange, the contents of which are almost entirely in dispute.

The parties also present rather disparate descriptions of the subsequent events. It is undisputed, however, that, sometime after defendant Cunningham arrived and began to write a traffic citation to the plaintiff for passing the road-block, the plaintiff drove away, leaving her son with the officers. The officers, in separate cars, gave chase. They managed to pull in front of the plaintiff at a four-way stop, but the plaintiff somehow circumvented them, failing to stop at a stop-sign in the process. The plaintiff finally stopped when defendant Riel pulled in front of the plaintiff's vehicle, and the plaintiff's vehicle struck defendant Riel's patrol car.

2

After the plaintiff's vehicle was stopped, defendant Riel grabbed the plaintiff and pulled her out of the passenger's side of the truck. Throughout the ensuing altercation, the plaintiff repeatedly stated that she was in pain and needed to see her physician. Defendant Cunningham, at some point, summoned an ambulance to the police station, presumably to meet them once they brought the plaintiff to the station. By this time, another policeman, Officer Morgan, had arrived at the scene.[1] His role in the plaintiff's arrest is also in dispute. Two officers handcuffed the plaintiff's wrists behind her back. It is undisputed, at least, that defendant Riel was one of them. The officers tried to put the plaintiff in the back of the patrol car, but, failing to do so, finally allowed her to sit in the front seat. At some point, the plaintiff's wrist began to bleed. The extent to which the wrist bled and the origins of the laceration also appear to be in dispute.

Upon arriving at the police station, the plaintiff was examined by the Emergency Medical Technicians ("EMT's") that defendant Cunningham had summoned earlier. The EMT's advised the officers that the plaintiff, who had been complaining of chest pains, needed immediate transportation to a hospital. The plaintiff was then driven to a hospital in Gadsden, Alabama, where physicians concluded that she was having a heart attack.

**Disputed facts**

The plaintiff's version

The plaintiff claims that, while she was driving on Highway 278 to take her son to a friend's home, she began to have difficulty breathing. She claims that she had felt a "smothering feeling" and had decided to drive directly to her physician before coming upon the road-block. Furthermore, the plaintiff claims that the "road-block" consisted of defendant Cunningham's

---

[1] Officer Morgan is not a defendant in this action.

3

patrol car, parked only partially in the eastbound lane. According to the plaintiff, she thought that defendant Cunningham had simply made a traffic stop, and that passing the patrol car was permissible. As the plaintiff turned onto Fifth Avenue, which, she asserts, is the route that she travels to go to her physician, she was stopped by defendant Riel. Defendant Riel, later joined by defendant Cunningham, began to give her a traffic citation for passing a funeral procession.

The plaintiff claims that, by this time, she could not breathe and felt that she needed immediate medical assistance. She alleges that she stepped out of her car and attempted to approach defendants Riel and Cunningham to tell them about her physical problems, but that defendant Riel told her to "[g]et back in the truck and shut your mouth and don't move." The plaintiff then claims that she decided to leave her son with the officers to receive the citation, and to drive one block down the street to her physician's office. She asserts that, when she started to drive down the street, defendant Riel drove up beside her, shook his fist at her, and yelled at her to pull over. The plaintiff alleges that when she reached the front of her physician's office, defendant Riel cut in front of her, causing her to hit his patrol car with her truck.

The plaintiff never reached the door of her physician's office. She claims that, once both vehicles had stopped, defendant Riel pulled her out of the passenger's side of the truck. She alleges that, after she had exited the truck, she told defendant Riel repeatedly that she could not breathe and that she needed to go into the physician's office. According to the plaintiff, defendant Riel responded each time with words to the effect of "I'm not taking you nowhere [sic]. You're going to jail." Then, according to the plaintiff, the defendants placed handcuffs on her wrists, claiming that she had hit or slapped defendant Riel. The plaintiff denies slapping defendant Riel, or intentionally hitting him at any time. The plaintiff claims that defendants Riel and Cunningham handcuffed her arms behind her back, even though she informed them that, just

4

the day before, surgical stitches had been removed from her breasts. She claims that her son, hovering near the scene, told the defendants that cuffing her hands behind her back made it even more difficult for her to breathe, but that the defendant officers refused to place the handcuffs in front of her. After she was handcuffed, the plaintiff asserts, she begged the defendants to, at least, retrieve her nitroglycerin pills from her purse, but the defendants again refused. The plaintiff also claims that the defendants handcuffed her violently, causing her wrist to bleed profusely.

The plaintiff was then taken to the patrol car, where, she alleges, defendant Riel first shoved her against the car, and then attempted, at length, to force her to bend down in order to enter the back seat. She claims that she attempted, to no avail at first, to tell defendant Riel that her artificial knee prevented her from bending over in the way that he demanded. After repeatedly pushing her head down to try to force her into the back seat of the car, which, the plaintiff claims, aggravated a pinched nerve in her neck, defendant Riel finally relented and allowed her to sit in the front of the patrol car. At that time, defendant Cunningham removed her handcuffs and allowed her to take some nitroglycerin.

The defendants took the plaintiff to the City of Piedmont Police Station. When the plaintiff arrived at the station, EMT's examined her and informed the defendants that the plaintiff needed immediate medical attention. The plaintiff was taken to Gadsden Regional Hospital, where physicians determined that she was having a heart attack.

The plaintiff was charged with Criminal Mischief, Harassment, Attempting to Elude, Failure to Comply with a Lawful Order, and Resisting Arrest. All charges eventually were dismissed, either at the municipal level, or on appeal to the circuit court.

The defendants' version

5

The defendants claim that, on July 7, 2000, around 3:40 P.M., defendant Cunningham had blocked Highway 278 for a funeral procession by completely "straddling" the eastbound lane of Highway 278 with his lights flashing. He observed the plaintiff circumvent the road-block and radioed to another unit to watch for the vehicle. According to defendant Cunningham, when he drove to the place where defendant Riel had stopped the plaintiff, the plaintiff was behaving belligerently. Defendant Cunningham claims that the plaintiff was saying, not that she was in need of medical assistance, but that Stan Davis (the deceased subject of the funeral procession) was dead, and that she did not need to stop for him. The defendants allege that, at that point, the plaintiff's son stepped out of the vehicle and told the officers that the plaintiff did not need to be in the hot sun. They ordered him to step back into the vehicle.

The defendants claim that the plaintiff then drove away from the scene, leaving her son by the side of the road. The officers gave chase, and defendant Riel managed to stop the plaintiff by cutting in front of her. The plaintiff hit defendant Riel's patrol car. The defendants allege that when they ordered the plaintiff to step out of the car, she refused, saying, apparently for the first time, that she needed to see her physician. At this point, defendant Cunningham claims, he radioed a request for an ambulance to be driven to the scene, but, at some later point, changed the request to ask for an ambulance to meet them at the police station.

They claim that, after defendant Riel pulled her from the passenger's side of the vehicle, the plaintiff struck him on the face. The defendants allege that officer Morgan, instead of defendant Cunningham, helped defendant Riel handcuff the plaintiff. They acknowledge that, while she was handcuffed, she received a small laceration on her wrist, but claim that she received that laceration while she was struggling and resisting arrest. Some time after the plaintiff entered the patrol car, they removed the handcuffs and administered nitroglycerin to her.

6

They note that the EMT's were waiting for the plaintiff when they arrived at the police station, and that she immediately was taken to the hospital from the station.

The defendants allege that the plaintiff did not intend to go to her physician's office until after they had stopped her the first time.[2] They also note that although the Circuit Court of Calhoun County had initially dismissed the charges against the plaintiff, it later determined that the dismissal was in error. The defendants assert that all charges except "Criminal Mischief" have been reinstated against the plaintiff.

## THE COMPLAINT

The plaintiff filed this action against the defendants in both their individual and official capacities on August 31, 2000. The complaint alleges violations of the plaintiff's Fourth and Fourteenth Amendment rights against excessive force and deliberate indifference to serious medical need, pursuant to 42 U.S.C. § 1983, and claims attorneys fees under the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988. The complaint also contains a count brought pursuant to Ala. Code § 11-47-190, for neglect, unskillfulness, and carelessness of officers in the scope of their employment, illegal detainment and deprivation of liberty, and failure to provide medical treatment. The complaint specifically purports to hold the City of Piedmont and Police Chief Trammell liable under section 11-47-190 for improper training. The plaintiff asks for compensatory and punitive damages, attorney fees, and injunctive relief.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment is to be granted if there is no genuine issue of material

---

[2] The defendants find support for this assertion in the plaintiff's deposition, pages 46-47. The plaintiff's deposition testimony conflicts with her prior statements before the City of Piedmont Municipal Court, found at Plaintiff's Exhibit 1, page 90. In the deposition, she states that she did not decide to go to her physician's office until after she was stopped. In the Municipal Court transcript, she states that she had decided to go to her physician's office before she came upon the road-block.

7

fact. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The evidence of the non-moving party is to be believed, and the court is not to attempt to perform jury functions such as credibility determinations. Id. After considering everything in the record, all permissible inferences are to be drawn in favor of the non-moving party. Clinkscales v. Chevron USA, Inc., 831 F.2d 1565, 1570 (11th Cir. 1987).

When the non-moving party has the burden of proof at trial, it must come forward with sufficient evidence on each element that must be proved. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). If the evidence is merely colorable or is not significantly probative, summary judgment may be proper. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). Summary judgment is appropriate if on any element there would be insufficient evidence to require submission of the case to a jury. Earley, 907 F.2d at 1080. "The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such circumstances, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

## ARGUMENT

### Federal Claims

#### Municipal Liability

The defendants argue that the record is devoid of evidence that the defendants' alleged

8

conduct was the consequence of an official city policy. They cite to Monell v. Department of Social Services, 436 U.S. 658 (1978) for the proposition that section 1983 liability may be imposed upon a municipal government only for its own officially-adopted unconstitutional or illegal policies. Because the plaintiff has not identified such a policy, the defendants argue, this court should grant summary judgment on the issue of municipal liability. The defendants also note that, pursuant to Monell, a municipality cannot be held liable under a theory of respondeat superior for the alleged torts of its officials. The court notes that, in the plaintiff's response brief, she neither mentions this argument, nor identifies an allegedly unconstitutional policy of the defendant City of Piedmont pursuant to which the defendant officers allegedly acted.

Individual liability

The defendants first argue that the facts of this case do not support a claim for excessive force or deliberate indifference to serious medical need. Next, the defendants each assert the defense of qualified immunity for suits against them in their individual capacities. The defendants argue that, in this case, qualified immunity is not based solely on the lack of an alleged violation of a clearly established right, but also on the officer's reasonable belief that the alleged violation was justified in light of the surrounding circumstances. The defendants contend that the proper inquiry in this case is whether, in light of clearly established law, and all of the objective facts, their actions were reasonable. The defendants argue that their behavior in arresting the plaintiff was objectively reasonable in light of their version of the facts: that the plaintiff ignored a road-block, drove away from the scene when they stopped her, and struck out at them when they stopped her again. They argue that, given the plaintiff's behavior, they were justified in handcuffing the plaintiff and arresting her.

The defendants next argue that they were not deliberately indifferent to the plaintiff's

9

medical needs. They claim that, as soon as the plaintiff told them that she had a medical condition, defendant Cunningham radioed for an ambulance to meet them at the police station. They also note that, once the EMT's determined that the plaintiff needed to go to the hospital, they allowed her to go.

The plaintiff argues that, under clearly established law, an excessive force inquiry must take into consideration the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted, citing Popham v. Kennesaw, 820 F.2d 1570 (11th Cir. 1987); Moore v. Gwinnet County, 967 F.2d 1495 (11th Cir. 1992). She further asserts that, pursuant to Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993), the Eleventh Circuit's fact-intensive approach to excessive force requires the court to determine whether the defendant's behavior was reasonable in light of "the severity of the crime, whether the suspect poses and immediate threat, and whether the suspect is resisting or fleeing."

Other factors to consider, according to the plaintiff, are "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of affecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend with at one time . . ." Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999). The plaintiff argues that, in light of these factors, the defendants' actions, under her version of the facts, were clearly unreasonable. According to the plaintiff, the defendants " arrested a 74-year-old female with no prior arrests, a litany of medical problems, and, at the time, unable to breathe . . . . pulled [her] out of her vehicle . . . handcuffed [her] so tightly that her wrists bled . . . [handcuffed her] behind her back even though she had informed the officers that . . . she had just had stitches removed

10

from her breast and underarm area . . . . shoved [her] up against the police car . . . [her] chest area being bruised . . . [and] had her head forcefully bent down . . . even after she informed him that she had an artificial knee and could not bend down that far." The plaintiff maintains that at no time did she resist arrest or try to flee, other than to try to seek medical attention for her breathing problem, and to try to alleviate her shortness of breath.

The plaintiff also argues that the defendants' actions rise to the level of deliberate indifference to her serious medical needs because, she alleges, they were aware of her inability to breathe and not only ignored her condition and denied her access to her nearby physician, but also deliberately exacerbated the problem by hand-cuffing her and forcing her into the patrol car. The plaintiff asserts that, by the time she was allowed to receive medical attention, her condition had deteriorated to the point that she had to be rushed to the hospital. She claims that her heart attack was the direct result of the stress created by the defendants' behavior.

**State law claims**

With regard to the state law claims, the defendants argue that they are entitled to discretionary function immunity under Ala. Code § 6-5-338. They assert that, when they arrested the plaintiff, they were acting with good faith within the line and scope of their duties as City of Piedmont police officers. They contend that, pursuant to Couch v. City of Sheffield, 708 So. 2d 144 (Ala. 1998), defendant City of Piedmont is immune from liability for the conduct of its agents. They also rely upon Couch for the proposition that the only way for the plaintiff to overcome their discretionary function immunity would be to show that their actions were so egregious that they demonstrated willfulness, maliciousness, or bad faith. The defendants argue that the facts of this case do not demonstrate the requisite willfulness, maliciousness, or bad faith.

11

The plaintiff maintains that the facts of the case, including the "stark" disparity between the parties' versions of the facts, demonstrate willfulness, maliciousness, and bad faith. She also argues that, pursuant to Ellison v. Town of Brookside, 481 So. 2d 890 (Ala. 1985), the City of Piedmont could be liable for the defendant officers' actions under § 11-14-190 if it is found that they used excessive force to arrest her. The plaintiff argues that she can demonstrate "unskillfulness" by demonstrating that the defendants officers' response to her condition fell below the response that a skilled officer would make under similar circumstances, citing Franklin v. City of Huntsville, 670 So. 2d 848 (Ala. 1995).

## DISCUSSION

### FEDERAL CLAIMS

#### Municipal Liability

The defendants correctly cite Monell with regard to the plaintiff's municipal liability claim under § 1983. The Eleventh Circuit, citing Monell, stated that

> "[t]he Supreme Court has placed strict limitations on municipal liability under section 1983. There is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers in making a false arrest. Instead, a municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation. [The plaintiff] must 'identify a municipal 'policy' or 'custom' that caused [his] injury.'"

Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)(citing Monell, 436 U.S. at 691; Board of County Com'rs v. Brown, 520 U.S. 397, __, 117 S. Ct. 1382, 1388 (1997)). Count I of the complaint, the § 1983 count, generally alleges that "it was through [official city and police department] policy that the Constitutional wrongs occurred." The plaintiff does not identify a specific municipal or department policy within Count I. However, under Count II, the state law count, she alleges that the defendants violated Ala. Code § 11-47-190 because they failed

12

properly to train their police officers.

According to the Eleventh Circuit, limited circumstances exist in which a municipality may be held liable for an "official policy" of failure adequately to train its police force. See Gold, 151 F.3d at 1350. The plaintiff alludes to "failure to train" in Count II of her complaint, but does not connect that alleged "failure to train" with the unconstitutional "official policy" that is pled in Count I. Even if the plaintiff intended to use an official policy of "failure to train" as grounds for holding the City of Piedmont liable under § 1983, she has introduced absolutely no evidence that the municipality's alleged failure properly to train its police officers "evidence[s] a 'deliberate indifference' to the rights of its inhabitants," as is required by Eleventh Circuit and Supreme Court case law. Id.; see also, City of Canton v. Harris, 489 U.S. 378, 388-389 (1989).

## **Official Capacity Liability**

Although the plaintiff's complaint clearly states that the plaintiff is bringing her claims against the defendants both in their individual and official capacities, neither party has addressed the plaintiff's ability, or inability, to seek money damages against official capacity defendants. Eleventh Amendment immunity bars § 1983 suits for money damages against state officials in their official capacities because such suits are, in effect, suits against the state and would result, in the case of a judgment for the plaintiff, in damages paid by state funds. Cross v. State of Alabama, 49 F.3d 1490, 1503 (11th Cir. 1995); Free v. Granger, 887 F.2d 1552, 1557 (11th Cir. 1989). Although the defendant officers are employed directly by defendant City of Piedmont and not by the State of Alabama, they are still arguably considered to be state officials, pursuant to Ala. Code § 6-5-338, which states that "[e]very peace officer . . . who is employed . . . pursuant to the Constitution or statutes of this state, whether . . . employed as such peace officer by the state or a county or municipality thereof, . . . created pursuant to the Constitution or laws

13

of this state . . . shall at all times be deemed to be officers of this state . . . ." Furthermore, at the pretrial conference, the plaintiff acknowledged that official capacity claims are, effectively, claims against the city. See Monell, 436 U.S. at 691 n. 55. The plaintiff further acknowledged that there is not sufficient evidence to support a federal claim against the city.

## Individual Capacity Liability: defendants Cunningham and Riel

### Qualified Immunity

Public officials, including police officers, are protected from actions brought against them in their individual capacities by qualified immunity if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known. Lassiter v. Alabama A&M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994)(en banc). Unless the conduct that forms the basis for the suit violates clearly established federal constitutional rights of which a reasonable person would have known *at the time that the alleged actions took place*, the official will be protected not only from federal liability, but also from the federal lawsuit itself. Sanders v. Howze, 177 F.3d 1245, 1249 (11th Cir. 1999). "For a right to be clearly established, previous case law must have developed it in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate the law." Id., citing Anderson v. Creighton, 482 U.S. 635, 640, 107 S. Ct. 30304 (1987); GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1366 (11th Cir. 1998). The defendants argue that, on July 7, 2000 the law, with respect to excessive force and deliberate indifference, was not sufficiently clearly established to give the defendants notice that their actions violated it.

The defendants argue that the plaintiff's excessive force and deliberate indifference claims must fail, not only because of qualified immunity, but also because the evidence of their conduct that the plaintiff has presented does not rise to the level of either excessive force or

14

deliberate indifference. Excessive force and deliberate indifference are causes of action for which a qualified immunity analysis involves mixed questions of fact and law. Therefore, the court will combine the qualified immunity and factual sufficiency analyses for each count.

Excessive force

"Whether a specific use of force is excessive turns on factors such as the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing." Post v. City of Ft. Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993). Because the analysis is applied on a case-by-case basis, it is difficult to establish a bright-line definition of the minimum amount of force that must be applied in order to qualify as "excessive force." Id. According to the court in Post, "Because [the excessive force] standard establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [defendant's] position to conclude the force was unlawful." Id. Therefore, this court must examine the plaintiff's evidence to determine whether, under these facts, the evidence is sufficient to establish that every reasonable officer would conclude that the force that the defendants allegedly applied was unlawful.

This court is not totally without guidance from prior case law. Several qualified immunity/excessive force cases had been decided prior to July 7, 2000 that analyze in great detail behavior and circumstances that, when combined, constitute excessive force, and those that, when combined, do not. In Post, as the defendants were arresting one of the plaintiffs, they "told [the plaintiff] that he was under arrrest. [The plaintiff] then put his hands up (the plaintiff says to be handcuffed). [The defendant] told [him] to stop resisting arrest, spun him around, placed him against a display case, applied a choke hold, and handcuffed him. Afterwards . . . [the defendant] pushed [him] into a wall." Id. at 1556. Witnesses to the arrest testified that,

15

from their perspective, the plaintiff was not resisting or interfering with the police in any way. Id. Although the Eleventh Circuit found that, once the plaintiff had been handcuffed, no further force was needed, and that shoving the plaintiff into the display case had been "unnecessary," it granted qualified immunity to the defendant because it was unclear from prior case law whether this amount of unnecessary-yet-harmless force was "plainly unlawful." Id.

Four years later, in Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997), the Eleventh Circuit awarded qualified immunity to a police officer who had shot a suspect as the suspect was running away from the police, carrying a sawed-off shotgun. The plaintiff, who had just committed a violent crime involving serious injury, had run past the defendant police officer, but had neither pointed the gun at the defendant officer after he had passed by, nor pointed the gun at anyone else as he was running away. Id. at 185. The plaintiff argued that the defendant was not entitled to qualified immunity because, after he had run past the defendant and continued running without turning around or raising his weapon, a reasonable person in the same situation would not think that his safety, or the safety of others, was at risk. Id. The court found that, although the plaintiff, at the time, was running away, and was not pointing the weapon at anyone, the possibility that he could have done so at any time justified the defendant officer's decision to shoot him. Id. According to the court, "[i]n view of all of the facts, we cannot say that an officer in those volatile circumstances could not reasonably have believed that [the plaintiff] might wheel around and fire his shotgun again . . . ." Id.

In Smith v. Mattox, 127 F.3d 1416, 1420 (11th Cir. 1997), the Eleventh Circuit upheld the district court's denial of qualified immunity to arresting police officers who, the plaintiff alleged, had used excessive force in arresting him. When the defendant officer first encountered the plaintiff in a reverse-sting drug operation, the plaintiff, who was carrying a baseball bat,

16

raised it in a threatening manner. Id. at 1417-1418. After the defendant officer drew his gun, the plaintiff dropped the bat, turned, and ran away. Id. at 1418. The officer pursued the plaintiff and eventually caught up to him, at which point, the plaintiff "docilely submitted to arrest upon [the defendant's] request for him to 'get down.'" Id. After the plaintiff was on the ground, the defendant put his knee in the small of the plaintiff's back, and handcuffed one arm behind his back, causing the plaintiff some discomfort. Id. When the plaintiff complained of the discomfort, the officer, "with a grunt and a blow– but no sign of anger– . . . broke [the plaintiff's] arm." Id. The defendant officer vehemently disputed the plaintiff's version of the facts, claiming that the plaintiff had not stopped struggling and resisting arrest until after his arm had been broken. Id.

The court, in denying qualified immunity to the defendant, acknowledged that no Fourth Amendment case existed in which a police officer, who had used non-deadly force against an initially-threatening-but-eventually-docile arrestee, had been held liable for excessive force. Id. at 1419. The court then found that the facts of the case placed it among those cases that cross "the hazy border between permissible and forbidden force . . . ." Id. The factors that the court found persuasive were not the severity of the crime, the safety threat posed by the suspect, or whether the suspect was resisting arrest or trying to flee, but were instead the officer's grunt, the blow that the plaintiff had felt, and the extent of injury to the plaintiff's arm. Id. The court found that the plaintiff's initial flight and threat with the baseball bat justified the use of some force; the force that the defendant had used, however, was too unnecessary and too violent. Id. at 1419-1420. According to the court, under the plaintiff's version of the facts, "the unlawfulness of the conduct is readily apparent even without the caselaw." Id. The court noted, however, that the grant of qualified immunity may be possible, later in the proceedings, "[i]f a

17

jury . . . indicates that it believes [the defendant's] testimony that [the plaintiff] continued to resist arrest until his arm was broken, it will be appropriate for the district court to revisit the issue whether [the defendant's] force was patently unreasonable." Id.

Next, in Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1997), the Eleventh Circuit again affirmed a district court's denial of qualified immunity to the defendant police officers. The defendants had approached the plaintiff's house in an attempt to retrieve some property from the plaintiff that the plaintiff's estranged roommate claimed belonged to her. Id. at 1397-1398. The property was not stolen; the roommate merely had left it in the plaintiff's house, and was now ready to take it. Id. The case does not explain why the roommate needed law enforcement to assist in the errand. The plaintiff initially refused to let the police officers and the roommate onto his property. Id. at 1398. The defendant officers finally convinced him to step out of the house to receive some property that the roommate was using as a bargaining tool to convince the plaintiff to return her property. Id. When the plaintiff did so, they grabbed his arms and neck, threw him to the floor, handcuffed his hands behind his back, dragged him away from his house, and shoved him into their patrol car. Id. When the plaintiff called to a neighbor to call his mother and his lawyer, and to lock his house, the defendant officers frisked the neighbor, found a small pocket knife, and, charging him with "obstruction," threw him down on the hood of the patrol car, cuffed his hands behind his back, and shoved him into the car with the plaintiff. Id.

The Eleventh Circuit, expounding upon the qualified immunity analysis in excessive force cases, stated that "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment" Id. at 1400. The court explained that qualified immunity would shield the defendant officers "if their actions were 'objectively

18

reasonable'-- that is, if a reasonable officer in the same situation would have believed that the force used was not excessive."[3]  Id.  According to the court, a determination of the reasonableness of the force would, then, turn on the factors set out in Post: the severity of the crime, the immediacy of a safety threat to the defendants or to others, and the level of resistance to arrest or attempts to flee.  Id.  The court found that, in the case before it, the officers had used excessive force because the plaintiff was not the suspect of a serious crime, had not posed a threat to anyone's safety by refusing to leave his house, and once arrested, did not actively resist the arrest.  Id.  The court held that "under the circumstances, the officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the force used was excessive."[4]  Id. (emphasis in original).

In Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998), the Eleventh Circuit denied qualified immunity to a defendant officer who, while arresting the plaintiff, "pushed her against a soda machine, handcuffed her, and dragged her to the police car."  Id.  The plaintiff and the defendant officer had been involved in a verbal argument and, when it appeared as though the plaintiff had won the battle of wits, the defendant officer "shoved the plaintiff . . . . pushed [her]

---

[3]  On the surface, the standards in Post and Thornton may appear to be subtly different in a way that would cause the Thornton standard to be less exacting-- the Post inquiry evaluates the conclusion of every reasonable officer in the defendant's position, while the Thornton inquiry examines the conclusion of only one reasonable officer.  In reality, Thornton simply re-works Post: determining objective lawfulness in the mind of one officer in order to award qualified immunity is the same as examining the objective unlawfulness of the defendant's actions in the minds of every reasonable officer to deny qualified immunity.  Either way, if just one reasonable officer could find that the defendant's actions were objectively lawful, qualified immunity should shield the defendant. Conducting the inquiry in light of the objective lawfulness of the defendant's actions instead of the objective unlawfulness, however, does not alleviate the plaintiff's burden to show that qualified immunity should not be awarded.

[4]  Although the conclusion that "a reasonable officer thus would have recognized that the force was excessive" suggests the application of a diluted standard, in light of the articulation of the standard in Post, as well as the presentation of the complete standard just two paragraphs earlier in the Thornton opinion, see Id., the Eleventh Circuit's real conclusion must have been either that every reasonable officer would have found the force unlawful, or that not even one reasonable officer would have believed that the force was not excessive.

again . . . threw her back [into a coke machine] . . . kneed [her] in the stomach . . . . grabbed [her] arm and squeezed it . . . . twisted her arm behind her back and locked handcuffs on her left wrist." Id. The court based its conclusion, in part, on finding no evidence to suggest that the plaintiff had posed a safety threat to anyone around her. Id. Furthermore, the court found that the defendant officers had lacked probable cause to arrest the plaintiff. Id. According to the court, the absolute lack of justification for both the physical force and the arrest precluded an award of qualified immunity.[5] Id.

In Nolin v. Isbell, 207 F.3d 1253, 1254-1255 (11th Cir. 2000), the plaintiff sued the defendant officer for excessive force in arresting the plaintiff during what the defendant officer perceived to be a street-fight between the plaintiff and a friend. Id. After breaking up the fight, the officer "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him." Id. at 1255. The plaintiff's injuries consisted solely of bruises caused by the rough treatment, which disappeared quickly. Id.

The defendant officer argued that the force that he used was, as a matter of law, insufficient to support an excessive force claim. Id. at 1255. The Eleventh Circuit, after reviewing several excessive force cases in which the plaintiffs' injuries were slight, declared that "we conclude this Circuit has established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." The court found that, in the instant case, the defendant officer's actions did not

---

[5] In reaching its conclusion, the court used the Post "inevitable unlawfulness for every reasonable officer" standard. 145 F.3d at 1238.

amount to excessive force under the de minimis force principle. Id. at 1258. In so holding, the court distinguished the facts of Nolin from the facts of both Sheth and Thornton, in which arresting officers who were denied qualified immunity used a similar level of force against their plaintiff arrestees. Id. According to the court, the defendants in Sheth and Thornton did not deserve qualified immunity, not so much because of the kind of force that they used against the plaintiffs, but because the absence of probable cause to arrest the plaintiffs in the first place caused any use of force to be "inappropriate." Id. at 1258; see also Thornton, 132 F.3d at 1400; Sheth, 145 F.3d at 1238. Because the defendant officer in Nolin arguably had probable cause to arrest the plaintiff, the use of a certain minimum level of force, especially when unaccompanied by lasting injuries, was objectively reasonable. 207 F.3d at 1258.

Finally, in Jackson v. Slicker, the Eleventh Circuit denied qualified immunity to arresting officers who, after they had already arrested and handcuffed the submissive and docile plaintiff arrestee, "kicked [the plaintiff] in the ribs and beat his head on the ground . . . . and knocked him unconscious." Id. at 1233. In affirming the district court's denial of qualified immunity, the Eleventh Circuit stated that "this evidence suggests that the officers used excessive force in beating [the arrestee] even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way. This evidential foundation is sufficient to raise a question of fact as to whether the officers' actions constituted excessive . . . force." Id. The court also noted that, even if an excessive force plaintiff cannot prove any kind of damages resulting from the defendant's conduct, if excessive force is found, a plaintiff is nonetheless entitled to a judgment and to nominal damages.[6] Id. at 1231-1232.

---

[6] The court also noted that the available damages for excessive force cases include not only medical expenses, missed work, and lost income, but also physical pain and suffering, and mental and emotional anguish.

In the application of all of these cases to the plaintiff's situation, this court recognizes that the proper inquiry in this case is whether the circumstances surrounding the plaintiff's arrest would inevitably lead to the conclusion, for every reasonable police officer in the same situation, that the defendants' actions were unlawful. This court is to consider the Post factors: the severity of the crime, the threat to the safety of the officers and others, and the level of resistance to arrest or attempts to flee. Because the facts of this case are so hotly disputed, the court will conduct the analysis based on the plaintiff's version of the facts and determine whether, if a jury were to accept, wholesale, the plaintiff's facts, the defendant officers in this case would still be entitled to qualified immunity as a matter of law. See Mattox, 127 F.3d at 1419-1420.

Under both parties' facts, the plaintiff was stopped for circumventing a roadblock, to which she admits.[7] She was arrested for driving away from a lawful police stop, again, to which she admits; for harassing a police officer, which she denies; and for resisting arrest, again, which she denies.[8] Since, however, she admits to circumventing the roadblock and to driving away from the lawful stop, probable cause for the arrest arguably existed. The inquiry does not end here, however. Analyzing the severity of the crime for which she was arrested and handcuffed, circumventing a funeral procession and leaving the scene of a lawful traffic stop, the court notes that the plaintiff's crimes, standing alone, were not so severe that a reasonable officer would feel that the use of more than limited force was warranted. This case is distinguishable from Montoute, Mattox, and Nolin, in which the plaintiffs were arrested for crimes involving shootings, drug deals, and street fights.

---

[7]  At least, the officers could have reasonably believed that she intentionally circumvented a road block.

[8]  The plaintiff was also charged with "Criminal Mischief in the Second Degree," a charge that was dismissed in the Municipal proceeding.

The plaintiff, at the time of her arrest, was a seventy-four-year-old female. While her catalog of medical complaints, the congestive heart failure; chronic obstructive pulmonary disease; asthma; or breast cancer; may not have been ascertainable to the defendant officers, her breathing problems, references to her physical ailments, and frequent requests for help should have been obvious. The temperature outside, around one-hundred-and-two degrees, apparently contributed to her breathing difficulties. Accepting her version of the facts, she began informing the defendant officers of her breathing problems the moment that they pulled her over, and continued to plead for medical attention even after the defendants pulled her from her vehicle, handcuffed her arms behind her back, and attempted to force her into their patrol car. Also accepting the plaintiff's allegation that she did not strike defendant Riel, this court finds that, after she was pulled from the vehicle, the safety threat that the plaintiff posed to the officers and to others was minimal, if not non-existent. Again, this case is distinguishable from Montoute, Mattox, and Nolin, in which the plaintiffs either carried weapons or had, just a few seconds before, been fighting, all of which demonstrated the potential for injury to the officer and innocent bystanders. Accepting the plaintiff's facts, the instant case is more like Sheth, in which the defendant officer's forceful arrest of the plaintiff appeared to be disproportionate to her actions.

Finally, the court finds[9] that, while the plaintiff was in her vehicle, the defendant officers had a modicum of reason to believe that she would continue to flee the scene. Accepting the plaintiff's allegations that she informed the defendants that she needed to see her physician, but also giving the defendant officers the legal benefit of the doubt in their split-second decision-

_____

[9] Of course, all "findings" are for purposes of considering the instant motion only, to determine what a reasonable officer would consider to be lawful and unlawful force under the circumstances.

23

making, the confusion evident in the entire situation initially may have prevented the officers from understanding that the plaintiff was attempting to drive to the nearby office of her personal physician. However, the fact that she may have fled the scene while in her truck accounts for only half of the facts in this case. The likelihood that a seventy-four-year-old woman with breathing difficulties, standing alone on the sidewalk, surrounded by policemen, would be a great flight risk is minimal. Once defendant Riel pulled the plaintiff from her truck to the sidewalk, the risk of flight became slight, at best.

Resistance to arrest is also part of the third inquiry. The defendant officers claim that the plaintiff struck defendant Riel when he pulled her out of the vehicle. The plaintiff denies striking him. Significant to note, however, is the fact that, regardless of whether the plaintiff did or did not strike defendant Riel, neither party's factual account shows the plaintiff slapping officer Riel and running away from the scene, or committing any other acts of resistance, such as kicking, biting, or struggling. The alleged slap is the only act specifically alleged by the defendants that would constitute the so-called "resistance" to arrest. The court finds that the plaintiff's "resistance to arrest," under either version of the facts, was not so vigorous as to warrant, considering the other circumstances, shoving the plaintiff against a car and handcuffing her arms behind her back.

This court will now address the application of the de minimis force exception, as expounded upon in Nolin, *supra*, to the facts of this case. In Nolin, the court granted the defendant officer qualified immunity because, while the force that he used upon the plaintiff caused bruises, he had probable cause to arrest the plaintiff, and the bruises that he had inflicted disappeared quickly. 207 F.3d at 1258. The facts surrounding the arrest involved a street fight between the plaintiff and another man. Id. at 1254-1255. The Nolin plaintiff obviously had

24

exhibited violent tendencies just a few moments prior to the arrest. The police officer, therefore, had every right to anticipate a violent response to arrest. Under the circumstances, the amount of force that the Nolin officer used fit the situation, and, since there were no lasting injuries, application of the de minimis force exception was proper. Id. at 1258. In this case, however, in addition to the foregoing analysis of the reasonableness of the officers' actions, the plaintiff has submitted photographic evidence of vivid welts and bruises on her right breast and wrists. She also purports to have submitted, in the form of examining physicians' reports, evidence that the distress of her experience with the defendant officers was, in some way, connected with her eventual heart attack. However, upon review of this evidence, the court does not find that the physicians who authored the reports clearly linked the plaintiff's heart attack with her arrest. Nevertheless, both reports describe a greatly emotionally distressed woman with shortness of breath, chest pains, and bruises. The court finds that, were a jury to credit the plaintiff's evidence, the defendant officers could not avail themselves of the de minimis force exception.

Many of the pertinent facts in this case are vigorously contested. The court notes that both the plaintiff and defendants have presented supporting evidence in the form of eye-witness affidavits and criminal trial testimony transcripts. This court cannot make credibility determinations with regard to the parties' evidence. Four Parcels, 941 F.2d at 1437. As the court reasoned in Mattox, if the jury does not accept all of the plaintiff's claims, but, instead, credits the defendants' testimony, for instance, that the plaintiff struck defendant Riel and resisted arrest, qualified immunity may be revisited. 127 F.3d at 1420. The jury's opinion may be obtained at the appropriate time through special interrogatories.

Deliberate Indifference

The standards for deliberate indifference to serious medical need and excessive force are

not the same. See Hudson v. McMillian, 503 U.S. 1, 5-9 (1992); Williams v. Burton, 943 F.2d 1572, 1576-1577 (11th Cir. 1991). In McElligot v. Fogby, the Eleventh Circuit stated that in order to prove deliberate indifference, a plaintiff must prove: (1) subjective knowledge of a risk of serious medical harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.[10] 182 F.3d 1248, 1255 (11th Cir. 1999). Ultimately, the plaintiff must show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000)(citing Estelle v. Gamble, 429 U.S. 97, 105 (1976)).

Any qualified immunity analysis should begin with the question of whether the plaintiff has alleged a constitutional violation at all. Campbell v. Sikes, 169 F.3d 1353, 1361 (11th Cir. 1999). The plaintiff claims that the defendants violated her Fourteenth Amendment Due Process rights by not allowing her to seek medical attention for her inability to breathe and for her chest pains while she was standing in front of her personal physician's office, by pushing her and handcuffing her while she was in a physically precarious position, and by taking her to the police station instead of to a hospital or to her physician. She claims that, although she repeatedly informed them that she could not breathe, was in pain, and was very close to her physician's office, the defendant officers nonetheless pushed her, handcuffed her arms behind her back, delayed allowing her to have a nitroglycerin pill, and took her to the police station. Once at the station, paramedics determined that the plaintiff needed emergency medical treatment, and

---

[10] In determining the point at which the conduct must lie along the spectrum between intent to harm and mere negligence, both the Eleventh Circuit and the Supreme Court have indicated that conduct amounting to recklessness, defined as the conscious disregard of a substantial risk of harm of which the defendant is aware, satisfies the fourth requirement. Farmer v. Brennan, 511 U.S. 825, 839, 114 S. Ct. 1970, 1980 (1994); Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996).

rushed her to the hospital. By the time the plaintiff arrived at the hospital, she was having a full-blown heart attack. It is reasonably arguable that the officers had no reason to refuse the plaintiff the immediate medical treatment that was readily available other than that they desired to take her to the police station first. Given the preceding analysis of the plaintiff's flight risk, this reason does not seem to be especially compelling.

A deliberate indifference analysis should begin with the question of whether the defendants' response to the plaintiff's need– regardless of their mental state– was so objectively inadequate that it satisfies the standard. Taylor, 221 F.3d at 1259. Accepting the plaintiff's version of the facts, that she was having difficulty breathing, that she was having chest pains, and that she repeatedly informed the officers of this fact, as well as the fact that it is clear, even to the casual observer, that the plaintiff is an elderly, heavy-set woman, this court finds that she has demonstrated an objectively serious need. The defendants' response to that need was to ignore it, at least until they had handcuffed her and tried to force her into the back of the patrol car. According to defendant Cunningham, he responded by summoning the paramedics, first, to the scene, and later, to the police station.[11] Once the plaintiff was in the front seat of the patrol car, they allowed her to have a nitroglycerin pill, which, by that time, was ineffective in staving off the heart attack. They then transported her to the police station, allowed her to be examined by the paramedics, and released her into their custody. Were a jury to accept the plaintiff's evidence, they may indeed find an objectively inadequate response to the plaintiff's medical needs.

The next question is whether the plaintiff has introduced evidence of the defendants'

---

[11] It is not clear why defendant Cunningham, after allegedly summoning the paramedics to the scene, later radioed them and told them to just meet the plaintiff at the police station.

27

subjective awareness of the plaintiff's need. The plaintiff alleges, and the defendants admit, that she repeatedly told them that she was unable to breathe and needed to see a physician. Furthermore, the plaintiff alleges that she repeatedly asked for the nitroglycerin tablets in her purse. The hospital reports submitted by the plaintiff state that she was positive for "shortness of breath," and that she already was having a heart attack when she arrived at the hospital. It is significant to note that, according to defendant Cunningham, he initially considered the plaintiff's condition to be sufficiently dire to radio for an ambulance to come to the scene. Although this court cannot see into the defendants' minds, it finds that both the plaintiff's and defendants' evidence would be sufficient to find that the defendants possessed subjective knowledge of the plaintiff's need.

Finally, the plaintiff must introduce evidence that the defendants' conduct exceeded mere negligence. The plaintiff and the defendants agree that the plaintiff repeatedly told them that she was unable to breathe and needed to see a physician. The evidence also shows that the confrontation that resulted in the handcuffing took place in front of the plaintiff's doctor's office. The defendant officers could have escorted her into the doctor's office for an emergency examination; an overweight seventy-four-year-old woman on foot could hardly present a great flight risk. However, they refused to give her this kind of immediate medical attention. In fact, defendant Cunningham states in his affidavit that he had, at first, radioed for an ambulance to come to the scene, but, later, changed his mind and requested that they meet the defendants and the plaintiff at the police station instead. Defendant Cunningham does not explain his reasons for re-routing the ambulance. A reasonable jury could find that the defendant officers recognized the existence of an emergency medical situation, but wilfully chose to delay the provision of medical treatment for their own obscure reasons.

28

The final inquiry is whether case law, as of July 7, 2000, had clearly established the plaintiff's constitutional rights in a sufficiently factually specific context to give the defendant officers notice that their actions violated the law. This case is one of delayed treatment; the plaintiff eventually received medical care. However, as early as 1985, the Eleventh Circuit held that "if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out." Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985)(citing Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir.1984)).

In Adams v. Franklin, 111 F. Supp. 2d 1255 (M.D. Ala. 2000), the plaintiff, a pre-trial detainee, sued his jailers and their supervisors for delaying medical treatment when he began to exhibit signs of a heart attack, including shortness of breath and chest pains. Id. at 1259-1260. As in the instant case, the plaintiff in Adams repeatedly informed his jailers that he was unable to breathe and that he was having chest pains. Id. His cell-mate also informed the jailers of his medical condition. Id. The defendants responded, first, by laughing at the plaintiff, then, by handcuffing him, pushing him against the cell wall a couple of times, removing the handcuffs, hitting him several times, and, finally, telling him to be quiet. Id. After two hours, the defendants called an ambulance. Id. Upon arriving at the hospital, it was discovered that the plaintiff was having a heart attack. Id. He spent two days in intensive care. Id.

The district court began its qualified immunity analysis with the following premise from Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994): "'delay in treatment of serious and painful injuries' suffered by a prisoner 'rises to the level of a constitutional claim.'" 111 F. Supp. 2d at 1269. The district court noted that, furthermore, "in cases where a government official delays medical treatment, deliberate indifference can 'be inferred from an unexplained delay in treating a known or obvious serious medical condition.'" Id. (quoting Harris, 21 F.3d at 394).

29

The court then noted that a heart condition undisputably is a serious medical need and concluded that the plaintiff's vocal complaints were sufficient to put the defendant jailers on notice of his condition. Id. at 1270.

With regard to the factually-similar-case-law analysis, the court noted that "[a] lack of case law with materially similar facts does not always mean that a government official is entitled to qualified immunity." Id. (citing McMillian v. Johnson, 88 F.3d 1554, 1565 (11th Cir. 1996), *vacated and amended on other grounds*, 101 F.3d 1363 (11th Cir. 1996)). The court noted that, in other deliberate indifference cases, a two-and-a-half hour delay in providing treatment for a bleeding facial cut, and a six-hour delay in treatment for broken bones were both held to be actionable. Id. citing Aldridge v. Montgomery, 753 F.2d 970 (11th Cir. 1985); Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990). Relying primarily on the holding in Harris, the court concluded that, as of 1997, "it was clearly established 'that deliberate indifference could be inferred from an unexplained delay in treating a known or obvious serious medical condition.'" Id. at 1271 (quoting Harris, 21 F.3d at 394). Given the facts of the case, the court found that, despite the absence of a preceding, factually similar case, "no reasonable official could conclude in light of the clearly established law that refusing, for no apparent reason, to provide medical treatment to a prisoner complaining of symptoms manifesting an imminent heart attack was constitutional. . . . [T]he court finds it inconceivable that [the defendants] could reasonably have believed their conduct was lawful under clearly established law." Id.

The holding of Adams, decided on July 31, 2000, cannot be relied upon to clearly establish law in this case, not only because it is not an Eleventh Circuit opinion, but also because it was decided after the incident at issue here. However, this court finds its analysis persuasive. If the Eleventh Circuit were to uphold the denial of qualified immunity based on a two-hour

30

delay in stitching a flesh wound, a delayed response to the symptoms of an impending heart attack, a much more urgent condition, certainly constitutes grounds for the denial of qualified immunity. Although they did not beat the plaintiff, as did the defendants in Adams, the defendants' actions in this case could be viewed as equally willful because they deliberately passed up two readily available opportunities to provide the seventy-four-year-old female plaintiff with emergency medical treatment prior to her arrival at the police station: first, by not allowing her to walk the few steps into her doctor's office, next, by canceling the request that an ambulance come to the scene. Moreover, accepting the plaintiff's facts, by handcuffing her arms behind her back, shoving her up against the patrol car, and attempting to force her into the back seat, all the while hearing her complain of shortness of breath and pain and beg for the nitroglycerin pills in her purse, a reasonable jury could find that the defendants wilfully exacerbated her already deteriorating physical condition. Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986). The plaintiff in the instant case has a tough burden in this regard, but should have the opportunity to prove to a jury facts that establish that the defendant officers fell into either one or both categories. It is not a decision for this court to make at this stage.

## Individual Capacity Liability: defendant Trammell

Although the plaintiff purports to bring an individual capacity claim against defendant Chief Trammell, she has introduced no evidence that shows that defendant Trammell either participated in the incident, or was actually aware of it and willfully failed to act. Defendant Trammell cannot be held liable under either the excessive force claim or the deliberate indifference claim unless the plaintiff shows that he either personally participated in the alleged constitutional violations, or was aware of the situation, but failed to act. According to the

31

Eleventh Circuit in Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999), "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." (citing Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir.1994)). The plaintiff has demonstrated no such personal participation or causal connection here.

## STATE CLAIM

The plaintiff brings her state law claim under Ala. Code section 11-47-190. Specifically, she states that "Plaintiff alleges that the City of Piedmont is liable to her under sec. 11-47-190, 1975 Code of Alabama, for the neglect, unskillfulness, and carelessness of its officers in their work in the line and scope of their employment; for illegal detainment, deprivation of liberty, and failure to provide medical treatment . . . also . . . Defendant City of Piedmont and Defendant Chief of Police is [sic] liable under § 11-47-190 for improper training of Defendant officers." The complaint, under this count, does not purport to hold the defendant officers liable, individually, under state law, for their alleged conduct. This omission is a result, perhaps, of the plaintiff's knowledge that, as a matter of law, she is unable to bring a claim against the individual defendant officers under section 11-47-190. As will be further developed below, section 11-47-190, the only state statutory section that the plaintiff pleads in her complaint, applies only to the municipality– the defendant City of Piedmont. The court refuses to read counts into the complaint that are not there; therefore, this court finds that the plaintiff has not brought a state law claim against the individual defendant officers. For the same reason, this

court finds that, because the plaintiff purports to bring a state law claim against defendant Chief

Trammell only under section 11-47-190, the plaintiff has not brought an actionable state law

claim against defendant Trammell.

## Respondeat Superior: Defendant City of Piedmont

The plaintiff correctly argues that the City of Piedmont can be held liable under Ala.

Code § 11-47-190 for the neglect, carelessness or unskillfulness of its agents in the scope of their

duties. City of Lanett v. Tomlinson, 659 So. 2d 68, 70 (Ala. 1995); Ellison v. Town of

Brookside, 481 So. 2d 890, 891 (Ala. 1985). The plaintiff purports to hold defendant City of

Piedmont liable for the defendant officers' neglect, carelessness, or unskillfulness under Ala.

Code § 11-47-190. The pertinent language of the statute is:

"No city or town shall be liable for damages for injury done to or wrong suffered
by any person or corporation, unless said injury or wrong was done or suffered
through the neglect, carelessness or unskillfulness of some agent, officer or
employee of the municipality engaged in work therefor and while acting in the
line of duty."

(emphasis added). This statute, on its face, establishes a limited respondeat superior liability for

a municipality for the acts of its employees or agents under a very narrow set of causes of action:

negligence, carelessness, and unskillfulness; it does not apply to intentional torts. Dollar v. City

of Ashford, 677 So. 2d 769, 770 (Ala. Civ. App. 1995). Therefore, the law dictates that if the

plaintiff can show that defendants Cunningham and Riel were, at least, negligent and/or

unskillful when they arrested her, and that their negligence and/or lack of skill injured her, under

section 11-47-190, she can subject the City of Piedmont to liability for their behavior. This

interpretation finds support in Ellison v. City of Brookside, 481 So. 2d 890, 891-892 (Ala. 1985),

in which the Alabama Supreme Court reversed the circuit court's dismissal of a case against a

municipality, for negligent injury during an arrest, because the plaintiff had failed to join the

33

defendant officers as parties to the suit. The court separated suits under the statute into two categories: those brought against the municipality for the negligence, unskillfulness, or carelessness of its officers in the line of duty, and those brought against the municipality for physical conditions of public streets, which were created or allowed to exist by 'a person or corporation not related in service to the municipality.' Id. (citing Isbell v. City of Huntsville, 295 So. 2d 607, 609 (Ala. 1976)). According to the Ellison court, the second classification, which would allow the plaintiff to hold the negligent third-party liable for the condition of the public streets, requires joinder of the third-party, whereas the first classification does not. Id. at 892. Therefore, in this case, even though the defendant officers are not parties to Count II of the complaint, the plaintiff could still seek to hold the City of Piedmont liable for their negligent, unskilled, or careless actions. Earlier, in City of Birmingham v. Thompson, 404 So. 2d 589, 592 (Ala. 1981), the court held that the plaintiff's section 11-47-190 suit against the City of Birmingham for the assault and battery committed by its police officers was actionable under a theory of "unskillfulness," because a skilled police officer would have responded to the situation without using excessive force. Again, the plaintiff sued only the municipality under section 11-47-190, not the police officers. Id. at 598-590.

The law in this area is not, however, quite as "cut and dried" as the preceding paragraph would indicate. In Montgomery v. City of Montgomery, 732 So. 2d 305, 312 (Ala. Civ. App. 1999), the Alabama Civil Court of Appeals applied the "substantive immunity rule," an exception to the rule of vicarious municipal liability for the negligence of municipal agents and employees, to a case involving a suit against a municipality and its police officers for false arrest and malicious prosecution.     The court first granted the police officers discretionary function immunity Id. It next held that "[t]here exists a narrow exception to the general rule that a

34

municipality is chargeable with the negligence of its agents . . . performing in the line and scope of their duty. . . . 'This exception, commonly known as the substantive immunity rule, is to be given operative effect only in the context of those public service activities of governmental entities . . . so laden with the public interest as to outweigh the incidental duty to the individual citizens.'" (quoting Rich v. City of Mobile, 410 So. 385, 387 (Ala. 1982)).  The court of appeals went on to conclude that "[o]fficers must be allowed to make decisions based on the circumstances of the case rather than on the potential for personal liability," and that "'principles of substantive immunity are particularly applicable to a case such as this one, where an officer is required to make difficult decisions on the spur of the moment.'" (quoting Flint v. City of Ozark, 652 So. 2d 245, 246 (Ala. 1994).  The Court of Appeals did not need to use the substantive immunity doctrine, however, because the Alabama Supreme Court had already held in Neighbors v. City of Birmingham, 384 So. 2d 113, 114 (Ala. 1980) that section 11-47-190's imposition of liability for negligence, unskillfulness, and carelessness did not include malicious prosecution or false arrest because a municipality cannot entertain malicious intent.  (citing Jackson v. City of Florence, 320 So. 2d 68, 75 (Ala. 1975)).  The Montgomery decision, based on substantive immunity, instead of simple Alabama Supreme Court precedent, could affect the ability of plaintiffs to hold municipalities accountable under section 11-47-190 for any act of the municipal police force.  Arguably, by its very operation, the police force serves an essential government function in the public interest.

In Rich, the case upon which the Court of Appeals in Montgomery relied, the Alabama Supreme Court applied the substantive immunity rule to a plaintiff's section 11-47-190 "second classification" suit against both the City of Mobile and its city plumbing inspectors.  410 So. 2d at 385.  The court found that, "[s]tated simply, Plaintiffs would have this Court hold: (1) the duty

35

imposed upon the city plumbing inspectors is one which is owed, not to the public generally, but to individual homeowners . . . this we cannot do. . . ." Id. The court held that overriding public policy dictated that liability not be imposed in this instance because of:

> "the broader requirement of the City to provide for the public health, safety, and welfare of its citizenry. While, as here, the individual homeowner is affected by the discharge of the City sewer inspector's duty, the City's larger obligation to the whole of its resident population is paramount; and the imposition of liability upon the City, particularly where the Plaintiffs' reliance upon the public inspection is secondary and inferential to their reliance upon the building contractor, necessarily threatens the benefits of such services to the public-at-large. . . . We believe these public policy considerations . . . override the general rule and prevent the imposition of a legal duty, the breach of which imposes liability, in those narrow areas of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart the City's legitimate efforts to provide such public services."

Id. at 387. The court subsequently emphasized the narrowness of its holding and its desire to avoid "[doing] violence to section 11-47-190. . . ." Id. As illustration of the narrowness of the holding, the Alabama Supreme Court referred to Thompson, a reference that suggests that the holding of Rich would not affect the imposition of liability in a case similar to Thompson. Id. at 388. At any rate, Rich did not purport to overrule or to limit Thompson.

## CONCLUSION

**Federal Claims**

With regard to the plaintiff's excessive force claim, the plaintiff's evidence, if believed, shows that the defendant officers stopped a seventy-four-year-old woman, who was experiencing breathing problems, after she circumvented a road-block. The clearly elderly, overweight woman immediately informed the defendant officers that she could not breathe properly and that she was going to her physician's office. After the officers stopped the plaintiff the second time, in front of her physician's office, they pulled her out of the passenger's side of her vehicle,

36

handcuffed her hands behind her back with enough force to bruise her wrists and cause them to
bleed, pushed her against one of their patrol cars with enough force to cause a vivid bruise on her
right breast, and attempted to force her into the back seat of the patrol car in spite of her artificial
knee.  Given the minor, misdemeanor nature of the "crimes" for which the plaintiff was arrested,
the obviously low risk of flight, and the minimal threat that the plaintiff posed to the officers and
to other people, a reasonable jury could find that the officers' actions were tortiously
disproportionate to the circumstances and were performed maliciously.

       With regard to the plaintiff's deliberate indifference claim, the plaintiff's evidence, if
believed, shows that, beginning at the time that she was first stopped, the plaintiff repeatedly
informed the defendant officers that she was experiencing breathing difficulties and needed to
see her physician, but that they ignored her.  When the defendant officers stopped the plaintiff
for the second time, in front of her physician's office, the plaintiff again informed them of her
need for medical assistance.  Despite the fact that the plaintiff's physician's office was just steps
away, the defendant officers tightly handcuffed the plaintiff's wrists behind her back, pushed her
into a patrol car, and tried to force her into the car's back seat.  In the meantime, the plaintiff was
complaining of pain, breathing difficulty, and begging for her nitroglycerin pills.  The defendant
officers not only refused the plaintiff access to her physician, but also canceled a request that an
ambulance come to the scene, in favor of putting the plaintiff in the front seat of the patrol car
and taking her to the police station.  They did not allow the plaintiff to have her nitroglycerin
until sometime after she was seated in the patrol car.  Once at the police station, EMT's
determined that the plaintiff really was in need of emergency assistance, and, at the hospital,
physicians discovered that the plaintiff was having a heart attack.  Given these facts, a
reasonable jury could find that the defendant officers knew that the plaintiff had a serious

                                              37

medical need, but deliberately, or recklessly, chose to ignore her need.

The court concludes that it cannot, at this stage, grant summary judgment to either defendant Cunningham or Riel in their individual capacities. The court will grant summary judgment to defendant Trammell and the City of Piedmont as to the Federal Claims.

**State Claims**

The court will grant summary judgment to defendant Trammell on the state law claim. The court will request additional briefing from the parties on the state law claim against the City of Piedmont.

Finally, the court again notes that it has based its conclusions on the facts as evidenced by the plaintiff's submissions. The court does not otherwise "find" facts. The court also notes that the Supreme Court of the United States will likely, by June 30, 2001, decide the case of <u>Katz v. United States</u>, 194 F.3d 962 (9th Cir. 1999), *cert. granted*, 121 S. Ct. 480 (U.S. Nov. 13, 2000)(No. 99-1977). That decision may cause the court to revisit its conclusions here.

The area of qualified immunity law is anything but clearly established. Some might consider this a close case . This court feels that the court should hear all the evidence before possibly entering a judgment as a matter of law. Of course, the defendants can make an interlocutory appeal.

**This  day of March, 2001,**

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**