IN THE UNITED STATES DISTRICT COURT FOR THE **FILED**
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

SEP 11 2001

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

HELEN HENDON,

      Plaintiff,

v.

      CV 00-PT-2421-E

RONALD REIL,

      Defendant.

**ENTERED**

SEP 11 2001

### MEMORANDUM OPINION

This cause comes to be heard on Motion for Judgment as Matter of Law, for New Trial and for Remittitur filed by the defendant, Ronald Reil, on June 22, 2001. On June 20, 2001, the jury returned a verdict in favor of plaintiff Helen Hendon against defendant Ronald Reil in the amount of $175,000.00. This court entered judgment pursuant to said verdict on June 21, 2001.

### FACTS

The facts stated most favorably to the plaintiff, or otherwise undisputed, include the following, some of which are denied by Reil.

Prior to July 7, 2000, the plaintiff had coronary heart disease and had three separate bypass surgeries. She had emphysema and problems with her breathing. She also suffered from depression and other medical problems. She was seventy-four years old. When she waked up on the morning of July 7, 2000, the plaintiff had trouble breathing. She told a friend that she did not feel like going to the friend's house. Later, her son asked her to drive him to the house of his friend. She told him that she did not feel like it and was "smothering," but relented although she had misgivings about driving. The temperature was high (at or near 102) and she did not have

1

51

much air conditioning in her truck. On her way to her son's friend's house, the plaintiff came upon an intersection in Piedmont, Alabama, where Officer Cunningham of the Piedmont Police Department was attending an oncoming funeral procession. The plaintiff drove around the police car which had flashing lights. She had seen the funeral procession but knew that she "couldn't sit there an hour in the sun." She told her son that she could not help it if they were going to stop her, "I'm smothering."

Officer Cunningham made a radio call to Officer Reil who pursued and stopped the plaintiff. She gave Officer Reil her driver's license and he returned to his car to radio for information on the license. Officer Cunningham had arrived and was writing her a ticket. At that point, the plaintiff had not suggested that she had a medical problem. She did have a disabled person sticker on her truck tag. After she gave Officer Reil the license and he returned to his car, plaintiff got out of her vehicle. Up to that point, she had not suggested a need for medical assistance. She then told Officer Riel that she was smothering and needed to go to a doctor. He allegedly told her to get back in her truck "and don't move." She got back in her truck, told her son that she was smothering and was going to the doctor. She told her son to get out of the truck and "tell them I'm going to the doctor." The son got out and plaintiff drove off without waiting for the officers. The officers followed her with flashing lights thinking that she was speeding. Officer Reil next tried to stop the plaintiff near an intersection where he pulled in front of her truck. When he backed off, she continued. Officer Reil followed her again and blocked her truck at a place near Dr. Ulrich's office. Dr. Ulrich had previously told the plaintiff not to come to him with such a problem, but to call an ambulance or go to the hospital.

Officer Reil "helped me out of the car."[1]   She again told Reil that she was smothering and having trouble breathing.  Reil put handcuffs on the plaintiff after, according to him, she slapped him.  Her wrist was somewhat cut, and bled.  No stitches or sutures were required.  The plaintiff admitted that no officer struck or hit her with anything.  After she was placed in a police car she was given her nitroglycerine by her son.  The plaintiff was immediately taken to the Piedmont Police Station where she was immediately examined by emergency medical technicians and shortly thereafter transported by ambulance to the Gadsden [Alabama] Regional Hospital where she was seen by Dr. Peter Szeto, a board certified cardiologist.  Dr. Szeto testified, inter alia, to the following:

(1) Plaintiff told him that she was out of breath that morning.  Her symptoms had started with shortness of breath.  She had a history of atrial fibrillation.

(2) When admitted, plaintiff was not complaining of chest pain, but still had shortness of breath.

(3) That plaintiff was taking coumadin, which is a blood thinner, and any patient taking that medication could be easily bruised.  Later, Dr. Szeto testified that she may have been temporarily off coumadin because of a scheduled breast biopsy.[2]  Dr. Szeto testified that if she

---

[1]  There is a dispute as to whether the plaintiff slapped Reil when she came out of her truck.  She did, however, on May 2, 2001, plead guilty in the Circuit Court of Calhoun County, Alabama, to "harassment" based upon a municipal complaint filed by Reil on July 10, 2000, charging plaintiff with slapping him during the course of an arrest.  On the same day, the plaintiff pled guilty to failing to comply with a lawful order based upon a traffic ticket and complaint made by Officer Cunningham.  The record reflects that she was represented by her attorney, Kenneth Frank Gray, Jr.  Plaintiff testified at this trial, "I may have hit him, Reil, because they had my hands up over my head and twisted it until I couldn't stand it."  This court denied Reil's motion for summary judgment on March 29, 2001, before the guilty pleas.  For a discussion of the collateral estoppel effect of plaintiff's criminal guilty pleas on a subsequent civil jury's assessment of disputed facts, *see Willingham v. Loughnan*, No. 99-4005, 2001 WL 920676 (11th Cir. Aug. 15, 2001).

[2]  At trial, the plaintiff so testified.  The court is satisfied, however, that there is no reasonable inference that plaintiff's bruises were not contributed to by a blood thinner.  The plaintiff acknowledged that on February 3, 2000, she told Dr. Ulrich that taking coumadin caused her to bruise easily.

was not on blood thinner, she might not bruise at all.

(4) That the plaintiff suffered a "small" myocardial infraction (heart attack).

(5) That plaintiff had a history of coronary artery disease and had by-pass surgery in 1995.

(6) A heart attack is usually caused by some triggering event. He then testified: "And in my reasoning, I think that the stressful situation, confrontation with the police officers *may* have contributed to the start or initiation of the heart attack, yeah." (Emphasis added).[3]

(7) That "as a rule, if there is any obstruction of blood flow to the heart, to their heart muscles, then within two hours, then damage would occur . . . . The longer you wait, the more damage there is."

(8) Plaintiff's July 18, 2000 pacemaker implant was not caused by the July 7, 2000 incident. It was the result of atrial fibrillation, a part of sick sinus syndrome, which she had had for some years. The July 18 admission was a "coincidence." "[P]robability is not related."

(9) Prior to July 7, 2000, plaintiff had pulmonary edema or congestive heart failure. She had been treated with coumadin.

(10) A person with a long-term history of coronary heart disease, such as plaintiff, is eventually more susceptible to myocardial infraction. Ninety-nine per cent of the time there is a triggering factor.

(11) Heart attacks are more common in the morning.

(12) Plaintiff had a history of depression and, thus, was more prone to a heart attack.

---

[3] Dr. Szeto never testified (he was not asked by either side) which aspect of the "confrontation" may have caused the heart attack, whether it be the roadblock, the two later stops, or being physically handcuffed. He did testify: "It's variable, meaning it's very difficult to say on set of symptoms to their actual time when heart attack started, with damage to the heart muscles or myocardium."

4

(13) It is possible that shortness of breath may be an indication of myocardial infarction.

(14) It was "possible" with her long medical history that she may have had a myocardial infraction regardless of any problems with the police. To pinpoint an exact cause is almost impossible, but there are usually some triggering factors. There were no apparent obstructive lesions to have caused a heart attack early on that day.

(15) After defendant's attorney recounted plaintiff's medical history and stated, "you cannot state, Doctor, with a reasonable degree of medical certainty that her arrest and detention by the Piedmont Police Department caused her coronary problems as a result of all these other possible stressful situations, can you?" Dr. Szeto responded, "No, I cannot. But everything has . . . " (interrupted). Dr. Szeto was probably about to reiterate his "triggering" statement.

## ANALYSIS

The only claim decided by the jury was the excessive force claim against Reil. The court had dismissed the excessive force claim against Cunningham because it was clear that he was not involved in any alleged force. The court dismissed the deliberate indifference to medical need claim(s) because the law is not established, clearly or otherwise, that immediately taking an arrestee to medical technicians a short distance away where an ambulance is available is deliberately indifferent.[4]

In essence, the facts are these: The plaintiff, a seventy-four year old woman, driving a truck with a "disabled" tag on a hot day avoided a police road block; was later stopped by Officer Reil; advised Officer Reil that she was "smothering" and going to a doctor and left before the police action was complete; avoided another attempt to stop her vehicle; was

---

[4] With regard to the deliberate indifference claim, compare *Silverman v. Ballantine*, 694 F.2d 1091, 1097 (7th Cir. 1982). Also see *Rasmussen v. Larson*, 863 F.2d 603 (8th Cir. 1988).

5

ultimately stopped, removed from her vehicle, handcuffed and taken to police station by the

defendant Reil for a medical examination; and was then diagnosed with having a small heart

attack arguably resulting from some phase of her confrontation with the police officers.

Unknown to the defendant at the time of the arrest, the plaintiff had a history of coronary heart

disease and heart bypass surgery and other medical problems. The plaintiff later, while

represented by an attorney, pled guilty to "harassment" premised on a complaint that she slapped

the defendant before she was handcuffed. She also pled guilty to a charge based upon her

bypassing the funeral procession roadblock.

## Applicable Standards

This court can grant a motion for a new trial "when the jury's verdict is against the great

weight of the evidence." *Carter v. Decisionone, Corp.*, 122 F.3d 997, 1004 (11th Cir. 1997).

Furthermore, this court can enter a judgment as a matter of law only "if a party has been fully

heard on an issue and there is no legally sufficient basis for a reasonable jury to find in favor of

that party on that issue." *Carter v. Decisionone*, 122 F.3d at 1003. This court must "evaluate all

of the evidence, together with any logical inferences therefrom, in the light most favorable to the

nonmoving party." *Id.* However, the "non-movant must present more than a mere scintilla of

evidence." *United States Steel v. Tieco, Inc.*, Nos. 00-11309, 00-12842, 2001 WL 936062, at *9

(11th Cir. Aug. 17, 2001). When considering this motion,

> [i]f the facts and inferences point overwhelmingly in favor of one party, such that
> reasonable people could not arrive at a contrary verdict, then the motion was
> properly granted. Conversely, if there is substantial evidence opposed to the
> motion such that reasonable people, in the exercise of impartial judgment, might
> reach differing conclusions, then such a motion was due to be denied and the case
> was properly submitted to the jury.

*Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). This court cannot "second-guess

6

the jury or substitute [this court's] judgment for its judgment if its verdict is supported by
sufficient evidence." *Lambert v. Fulton County*, 253 F.3d 588, 594 (11th Cir. 2001). Of course,
to the extent that the pertinent facts are undisputed, the issue of qualified immunity is for the
court.

The Supreme Court has recently determined that the assessment of whether a public
official is entitled to qualified immunity is a two-step inquiry. First, the trial court must
determine whether a constitutional right has been violated on the facts alleged. *Saucier v. Katz*,
531 U.S. 991, 121 S. Ct. 2151, 2155 (2001). The court must assess the facts in a light most
favorable to the party asserting the injury. *Id.* at 2156. Second, if a violation has been
established, the court must determine whether the right was "clearly established." *Id.* This
inquiry is to be made in light of the "specific context of the case" and not as a "broad general
proposition." *Id.* The Supreme Court requires "'that the right the official is alleged to have
violated must have been 'clearly established' in a more particularized, and hence more relevant,
sense: The contours of the right must be sufficiently clear that a reasonable official would
understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483
U.S. 635, 640 (1987)). The dispositive inquiry in determining whether the right is clearly
established is "whether it would be clear to a reasonable officer that his conduct was unlawful in
the situation he confronted." *Id.* (citing *Wilson v. Lane*, 526 U.S. 603, 615 (1999)).

When addressing "excessive force" cases, the first inquiry for the court, whether a
constitutional right has been violated, is guided by the mandates established in *Graham v.
Connor*. 490 U.S. 386 (1989). When an excessive force claim arises in the context of an arrest
or investigatory stop, it is to be "characterized as one invoking the protections of the Fourth
Amendment, which guarantees citizens the right 'to be secure in their persons . . . against

7

unreasonable . . . seizures' of the person." *Id.* at 394. The court is to apply the Fourth
Amendment's "objective reasonableness" standard which requires a "careful balancing of 'the
nature and quality of the intrusion on the individual's Fourth Amendment interests' against the
countervailing governmental interests at stake." *Id.* at 395-96 (quoting *Tennessee v. Garner*, 471
U.S. 1, 8 (1985)). The question the court must answer is "whether the officers' actions are
'objectively reasonable' in light of the facts and circumstances confronting them, without regard
to their underlying intent or motivation." *Id.* at 397. The Supreme Court's Fourth Amendment
jurisprudence has recognized that the "right to make an arrest or investigatory stop necessarily
carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*
at 396. Consequently, the proper application of the "objective reasonableness" test requires
"careful attention to the facts and circumstances of each particular case, including the severity of
the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or
others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*
Furthermore, the reasonableness of the force "must be judged from the perspective of a
reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The court
must allow for the fact that "police officers are often forced to make split-second judgments– in
circumstances that are tense, uncertain, and rapidly evolving. . . ." *Id.* at 397.

The Eleventh Circuit has provided further guidance for this inquiry. The Eleventh
Circuit has stated that "[q]ualified immunity protects from civil liability government officials
who perform discretionary functions if the conduct of the officials does not violate 'clearly
established statutory or constitutional rights of which a reasonable person would have known.'"
*Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S.
800, 818 (1982). When determining whether an officer's use of force was objectively

8

reasonable, a court should consider "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Moore v. Gwinnett County*, 967 F.2d 1495, 1498 (11th Cir. 1992) (quoting *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986). The Eleventh Circuit has explained that in excessive force cases, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer . . . to conclude the force was unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993). This standard of objective reasonableness which is used to assess an officer's entitlement to qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Furthermore, the Eleventh Circuit has observed that it has "established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at 1257.

With regard to whether the constitutional right was "clearly established," the Eleventh Circuit has announced that the "case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in defendant's place, that what he is doing violates federal law." *Priester*, 208 F.3d at 926 (quoting *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994)). As the Eleventh Circuit has noted, "[a] reasonable official's awareness of the existence of an abstract right, such as a right to be free from excessive force, does not equate to knowledge that his conduct infringes the right." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). Consequently, "'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always

9

protects the defendant.'" *Id.* (quoting *Kelly v. Curtis*, 21 F.3d 1544, 1550 (11th Cir. 1994). The Eleventh Circuit has concluded that in the context of Fourth Amendment excessive force claims, no bright line exists for identifying when force is excessive; therefore, unless a "controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Priester*, 208 F.3d at 926.

With that said, the Eleventh Circuit has recognized that a narrow exception exists to the "rule requiring particularized case law to establish clearly the law in excessive force cases." *Id.* The Eleventh Circuit has held that when an excessive force plaintiff shows "'that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw,' the official is not entitled to the defense of qualified immunity." *Id.* (quoting *Smith*, 127 F.3d at 1419). However, to come within this narrow exception, the plaintiff must demonstrate that the official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Smith*, 127 F.3d at 1419. The court must determine whether "application of the [excessive force] standard would inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Post*, 7 F.3d at 1559. Therefore, under both the general rule and its narrow exception, "'pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable governmental agent that what defendant is doing violates federal law in the circumstances' for qualified immunity to be unavailable to a defendant." *Priester*, 208 F.3d at 927 (quoting *Lassiter*, 28 F.3d at 1150).

10

## Plaintiff's Argued Clearly Established Law

By order dated July 9, 2001, this court directed the plaintiff to address the holding of *Saucier v. Katz*, 531 U.S. 991, 121 S. Ct. 2151 (2001), where the Supreme Court held that qualified immunity should be granted on the excessive force claim in that case because the plaintiff had not "identified any case demonstrating a *clearly established rule* prohibiting the officer from acting as he did, nor are we aware of any such rule." 121 S. Ct. at 2160 (emphasis added). In addressing *Saucier*, the only case cited by the plaintiff to demonstrate that Officer Reil's actions were contrary to clearly established law in the Eleventh Circuit was *Sheth v. Webster*, 145 F.3d 1231 (11th Cir. 1998). *Sheth* does not "clearly establish" the law pertinent to this case for two reasons. First, the Eleventh Circuit held in *Sheth* that there was no justification for the police officer's use of force. *Id.* at 1238. The plaintiff in *Sheth* simply contradicted a police officer regarding his knowledge of local laws and there was no probable cause for an arrest. *Id.* at 1234. In this case, to the contrary, Officer Reil was justified in arresting the plaintiff. The plaintiff had disregarded a police roadblock for an oncoming funeral procession. After being pulled over by Officer Reil, plaintiff left the scene before Officer Reil could finish issuing her the traffic citation. Finally, when Officer Reil pursued the plaintiff and attempted to stop her at an intersection, the plaintiff disregarded his efforts and drove off again. Given these facts, Officer Reil was justified in arresting the plaintiff.[5]

Second, the level of force displayed by the police in *Sheth* was far more excessive than the force used by Officer Reil. In *Sheth*, the Eleventh Circuit found that the following actions "'would inevitably lead every reasonable officer . . . to conclude that the force was unlawful:'"

---

[5]  The plaintiff has made no claim based upon false arrest. She pled guilty to two offenses

11

> He shoved the plaintiff, who stumbled. He pushed again. The plaintiff cried to
> [the officer] that he was hurting her. He threw her back again. According to one
> witness, he kneed the plaintiff in the stomach. Sheth fell back against a Coke
> machine, five to twelve feet from where she stood.

*Id.* at 1234, 1238. In the this action, Officer Reil did not use this type of egregious force. The

plaintiff admitted that no officer struck or hit her with anything. Officer Reil simply removed

plaintiff from her vehicle and placed handcuffs on her.

On the other hand, a case which is remarkably similar to this case is *Moore v. Gwinnett*

*County*, 967 F.2d 1495 (11th Cir. 1992). In *Moore*, a woman in her eighth month of pregnancy

encountered a police road barricade on the way to visit her husband's place of employment. The

woman stopped at the barricade and waved to the police officer to come to her vehicle. The

officer acknowledged her wave but did not immediately approach her vehicle. The woman

drove around the barricade and the police officer pursued with his lights flashing and siren

sounding. She eventually pulled into the parking lot at her husband's place of employment and

ran inside the building. After she emerged from the building with her husband, the police officer

requested her driver's license and informed her that he was going to issue her a ticket for running

the roadblock. She refused to provide her driver's license and attempted to reenter the building.

The police officer announced that he was taking her to jail and grabbed her with both of his arms

– taking her left arm in one hand and placing his right arm across her abdomen. Despite this

action, she was able to pivot loose from the officer and ran into the building. At this point, her

husband informed the officer she was eight months pregnant. Although she did not produce her

license, she did provide the officer with her name. The police officer radioed in her name and

was informed that her license was suspended. The police office then charged her with failure to

obey a traffic control device and driving with a suspended license. He allowed her husband to

drive her to the county jail where she was detained three hours.

Two days after these events, the woman noticed a sensation that her fetus was inactive. She visited her obstetrician and was advised that the fetus' heart was beating. Unfortunately, a week after the incident she was informed that the fetus was dead. She sued the police officer under 42 U.S.C. § 1983 for violation of her Fourth Amendment rights. The police officer moved for summary judgment based on his entitlement to qualified immunity. The district court denied summary judgment and the Eleventh Circuit reversed.

The Eleventh Circuit explained that whether a police officer is entitled to qualified immunity on an excessive force claim depends on whether his "actions were objectively unreasonable under the law which was clearly established at the time of the incident." *Id.* at 1498. It stated that the police officers actions must be evaluated with reference to four factors: "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Id.* The panel noted that the third and fourth factors lent weak support to her claim. *Id.* The panel was persuaded to this conclusion because the only expert medical opinion offered indicated that no injury to her or her unborn child resulted from the incident. *Id.* at 1498-99. The panel found its analysis of the second factor dispositive. It noted that the present case involved none of the indications of excessive force recognized in its past cases. *Id.* at 1499. The panel commented that there was a need for physical restraint because she was attempting to flee for a second time. *Id.* It noted that the officer simply put his hands around her and did not apply greater force after she pivoted away. *Id.* Furthermore, the panel commented that the officer did not strike her, throw her to the ground, pull her against him, or use or brandish a weapon. *Id.* Consequently, the panel concluded that "common sense

13

dictates a finding that Officer Meadow's use of force was reasonable according to established standards. . . . *The act of physically holding back a misdemeanor suspect who is attempting to leave the scene, even given her pregnant condition, cannot sensibly be considered disproportionate as measured by this circuit's precedents*" *Id.* (emphasis added).

In *Gold v. City of Miami*, 121 F.3d 1442 (1997), the Eleventh Circuit reversed the district court's denial of the police officer's motion for summary judgment on the issue of qualified immunity. In *Gold*, an individual stated in front of several police officers that "Miami police don't do shit." *Id.* at 1444. A police officer approached Gold and asked him for his identification. Gold complied and was subsequently informed that he was under arrest for disorderly conduct. He was handcuffed and placed in the back of a patrol car. Gold complained that the handcuffs were applied to tightly and that he was in pain. The officers loosened the handcuffs about twenty minutes after the complaint. Based on these facts, the panel found that Gold was only in pain for about twenty minutes and suffered only skin abrasions that did not require medical treatment. Given these facts, the panel stated that "these circumstances would not 'inevitably lead' a reasonable officer in the officers' positions to conclude that the force used to apply the handcuffs was unlawful." *Id.* at 1446-47. Consequently, the panel held that the officers were entitled to qualified immunity on the excessive force claim.

In *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (1993), the Eleventh Circuit reversed the district court's denial of the police officers' summary judgment motion based on qualified immunity. In *Post*, the plaintiffs were arrested for code violations involving their restaurant's capacity. During the arrests, one of the plaintiffs was spun around, placed against a display case, had a choke hold applied against him, and was handcuffed. He was also pushed against a wall when the officer took him outside the restaurant. The panel found that the police officer was

14

entitled to qualified immunity because it was not clearly established that the amount of force he used was unlawful. The panel stated that although the force may have been unnecessary, it was not clear from the case law that it was excessive. Thus, the police officer was entitled to qualified immunity.

Some cases from other circuits worth noting are the following: *Walton v. City of Southfield*, 995 F.2d 1331 (6th Cir. 1993) (affirming denial of summary judgment in excessive force case where grandmother, who had just come from doctor's appointment for shoulder injury, was handcuffed behind her back after repeated requests to police officer that she not be handcuffed in that fashion); *Miller v. Layton City*, 232 F.3d 902 (10th Cir. 2000) (reversing grant of summary judgment on excessive force claim where officer grabbed hands of sixty-year old man with arthritis, kicked his legs out from under him, and caused him to break his clavicle and dislocate his shoulder when he hit the ground); *Babb v. Deomampo*, No. 99-55147, 2000 WL 1208199 (9th Cir. Aug. 24, 2000) (affirming grant of summary judgment in excessive force case where seventy-four year old woman was handcuffed behind her back for thirty minutes while police questioned her about her involvement in crime); *Randles v. Gregart*, 965 F.2d 90 (6th Cir. 1992) (affirming dismissal of excessive force claim where elderly man had his rifle wrestled away from after he refused to relinquish it after a request by law enforcement officers); *Rasmussen v. Larson*, 863 F.2d 603 (8th Cir. 1988) (affirming grant of summary judgment on excessive force claim where officers forcibly pried decedent's arm and hand away from door frame, escorted decedent outside, put handcuffs on him, conducted a patdown search, and decedent died three days later of probable myocardial infarction); *Silverman v. Ballantine*, 694 F.2d 1091 (7th Cir. 1982) (affirming grant of summary judgment on excessive force claim even though decedent died of heart attack during arrest; decedent refused to allow officers to enforce

15

writ of replevin, resisted arrest by flinging officers off him, and only suffered heart attack once four officers successfully placed handcuffs on him).

## COURT'S CONCLUSIONS

### Judgment as Matter of Law

**(1)      Constitutional Violation?**

Considering the first phase of the *Saucier* analysis, this court concludes that there was not sufficient evidence to create a reasonable inference that there was a Fourth Amendment violation based upon the use of excessive force.  Considering this phase, the court must focus on all the circumstances leading to the arrest and the circumstances during the arrest, rather than just the arguably resulting "small" heart attack.  The court must consider the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically. *Moore*, 967 F.2d at 1498.  Further, the court must consider the severity of the crime at issue, whether the plaintiff posed an immediate threat to the safety of the officers or others, and whether the plaintiff is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.  The analysis should not be based upon only 20/20 hindsight vision.  The court notes the following with regard to these factors.

### Circumstances Leading to the Arrest

The plaintiff pled guilty to running a roadblock.  Further, she left the scene of one traffic stop and avoided another attempt to stop her before reaching the place of arrest.

### Circumstances During the Arrest

Reil had to pull his vehicle in front of plaintiff's vehicle in order to stop her.  She pled guilty to harassing Reil based upon his complaint of "slapping" him before she was handcuffed.

16

The cuffing caused a cut, which was not treated, and bruises which likely resulted from coumadin. There was no hitting or striking by any police officer.

### Degree of Force Applied

There is no reasonable inference that any more force was applied than would be usually and reasonably applied in handcuffing an arrestee.

### Need for Application of Force and Relation Thereof to Need

The slight force that was applied was needed to handcuff the plaintiff. In *Babb v. Deomampo*, No. 99-55147, 2000 WL 1208199 (9th Cir. Aug. 24, 2000), the court rejected an argument that it was per se unreasonable to handcuff a 74-year-old woman.

### Extent of Injury

Of course, a small heart attack is severe. There is no reasonable inference, however, that Reil knew or should have known that his action would result in a heart attack just because the plaintiff may have been "smothering" on a hot day. He did not know of her prior medical history. The court assumes, without deciding, that the arrest itself contributed to the heart attack, although it is not clear at what stage of the conflict any such attack occurred. The bruises were abnormal and not caused by excessive force.

### Mental State of Reil

There is no reasonable inference that Reil acted maliciously or sadistically.

### Severity of Crime

The purported misdemeanors were minimal, but escalated with possible traffic hazards being created.

### Threat to Officers or Others

There was no threat to the officers. The plaintiff's driving could have, however, been

17

reasonably construed as a traffic hazard.

Evading Arrest and Flight

The plaintiff continued to leave the various scenes and pled guilty to harassing Reil.

All the foregoing factors considered, it is clear that there was no use of unreasonable or excessive force. Some might argue that Reil used poor judgment in continuing to try to stop an elderly, "smothering" driver. Others might say that he was just doing his job. He could not be held responsible, however, for her prior medical condition or her decision to drive when she did not feel comfortable in doing so. The court concludes that there was not sufficient evidence to establish a reasonable inference of excessive force by Reil. A reasonable jury, properly applying the law to the facts, could not have found such a violation.[6]

**(2)   Qualified Immunity**

In the alternative, the court concludes that Reil is entitled to qualified immunity for the alleged violation. He was engaged in a discretionary function. It is clear that not every reasonable officer would conclude that the force used by Reil was unlawful. His actions do not demonstrate plain incompetence nor a knowing violation of the law.

The plaintiff has not cited nor has the court found a controlling Fifth Circuit case, an Eleventh Circuit case nor a Supreme Court case which, in a concrete and factually defined context, make it obvious to all police officers that Reil's conduct violated the law. There are controlling cases which suggest to the contrary. There has been no bright line staked out identifying Reil's conduct as excessive.

Furthermore, this is clearly not a case where Reil should have known that he was

---

[6] A reasonable jury might well have had sympathy for the plaintiff, but that is not an appropriate standard to be applied. There must be an objective review. *See Graham*, 490 U.S. at 397.

violating the Constitution even without caselaw on the point.[7] This is certainly not a *Priester*
case. The plaintiff was clearly avoiding intervention by the police. This court cannot conclude
that only an incompetent officer or a knowing violator would have reacted as did Reil.

The issue is whether Reil used excessive force in accomplishing the arrest. There is no
reasonable inference that he used excessive force. It is a sad fact that any confrontation and any
force may have contributed to a heart attack. The result, however, does not convert reasonable
force under the circumstances into excessive force. There is no reasonable inference that Reil
knew or should have known that handcuffing the plaintiff when she was "smothering" from the
heat would cause her a severe injury. Police officers are not required to be prescient. The fact
that the plaintiff arguably suffered a small heart attack at some unknown time does not, in and of
itself, create a reasonable inference that the force used was excessive.[8]

In this case the force applied was de minimis. *See Nolin*, 207 F.3d at 1257. If the
plaintiff's heart attack was caused by that force, it was because she had a predisposition to such
an attack if there were a confrontational triggering event. Dr. Szeto did not testify that the attack
resulted from the use of excessive force, only that the "stressful situation, confrontation with the
police officers may have contributed to the start or initiation of the heart attack . . . ."

The court will grant defendant Reil's motion for judgment as a matter of law. The court
will give alternative consideration to the motion for new trial.

---

[7] *See Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (recognizing narrow exception
to the clearly established caselaw rule for plainly egregious violations of the Fourth Amendment).

[8] Compare *Silverman v. Ballantine*, *supra*, where the alleged victim died from a heart attack during the
service of a writ. Also compare *Rasmussen v. Larson*, *supra*, where the arrestee died of a heart attack three days
after the arrest during which some force was used.

19

## New Trial

If the evidence is deemed sufficient to defeat a motion for judgment as a matter of law, it will also likely defeat a motion for new trial based upon an argument that the jury verdict is against the great weight of the evidence with regard to the events surrounding the arrest. The most suspect aspect of the jury verdict as it relates to new trial consideration is the apparent finding that the "force" applied by Reil triggered the heart attack rather than its being caused by the overall confrontation with the police officers. Dr. Szeto did not testify what aspect of the continuing confrontation triggered the attack. He did not attribute it to the use of force.

Nevertheless, the court will not, in the alternative, grant the motion for new trial in total. The court does conclude, however, that the amount of the verdict is excessive and based upon passion rather than reason. There is no reasonable inference that the force applied, as such, caused all the possible damage resulting from the heart attack. The court concludes that any amount of recovery in excess of ninety thousand ($90,000) is excessive. Unless, within ten days, the plaintiff files a remittitur of the amount of the judgment in excess of $90,000, the alternative motion for new trial will be deemed granted.

20

## SUMMARY

The motion of defendant Reil for judgment as a matter of law will be granted.  The alternative motion for new trial will be deemed granted unless the plaintiff, within ten days, files a remittitur of any portion of the judgment amount in excess of $90,000.

This ___ day of September 2001.

Robert B. Propst
Senior United States District Court Judge

21